Argued and submitted May 8, affirmed July 9, petition for review allowed December 24, 2008 (345 Or 503)

Elizabeth JOHNSON
and The Confederated Tribes of
The Warm Springs Reservation of Oregon,
*Petitioners below,*
*and*
CENTRAL OREGON LANDWATCH,
Friends of the Metolius,
and Pete Schay,
*Petitioners,*
*v.*
JEFFERSON COUNTY,
Ponderosa Land & Cattle Co., LLC,
Dutch Pacific Resources,
and Shane Lundgren,
*Respondents,*
*and*
Irwin B. HOLZMAN,
*Intervenor-Respondent below.*
Land Use Board of Appeals
2007016, 2007018, 2007021, 2007022,
2007025, 2007026, 2007030, 2007031; A138263

189 P3d 30

Paul D. Dewey argued the cause and filed the brief for petitioners.

Megan D. Walseth argued the cause for respondent Ponderosa Land & Cattle Co., LLC. With her on the brief were Steven P. Hultberg and Ball Janik LLP.

Roger A. Alfred argued the cause for respondents Dutch Pacific Resources and Shane Lundgren. With him on the brief were Corinne S. Celko, Steven L. Pfeiffer, and Perkins Coie LLP.

David C. Allen filed the brief for respondent Jefferson County.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

HASELTON, P. J.

## HASELTON, P. J.

Petitioners (Central Oregon LandWatch, Friends of the Metolius, and Pete Schay) seek review of a decision of the Land Use Board of Appeals (LUBA) that affirmed in part the decision of the Jefferson County Board of Commissioners to adopt certain amendments to the county's comprehensive plan (post-acknowledgment plan amendments, or PAPAs) and zoning ordinances pertaining to destination resorts. Several of petitioners' arguments, described in more detail below, center on their concern that the county, in making those amendments to allow for the siting of destination resorts, failed to ensure adequate protection under Goal 5 for the headwaters of the Metolius River.[1] More particularly, petitioners suggest that the county failed to adequately address the possibility that the siting of destination resorts several miles from the headwaters of the river could affect the aquifer that feeds the springs at the headwaters. Petitioners also argue that LUBA erred in determining that the county adequately addressed fire hazards under Goal 7 in its amendments. We reject petitioners' arguments concerning fire hazards without discussion, and write only to address petitioners' arguments concerning Goal 5 protections for the headwaters of the Metolius River. As explained below, we affirm LUBA's decision.

The circumstances bearing on our review are undisputed. In 2006, the Jefferson County Board of Commissioners considered amendments proposed by the county's planning commission to amend the Jefferson County Comprehensive Plan as well as the Jefferson County Zoning Ordinances, in order to provide for the siting of destination resorts in Jefferson County. Ultimately, the county adopted a number of changes to the plan and zoning ordinances at issue in the present case, and also adopted certain specific provisions

---

[1] Goal 5 requires local governments to "adopt programs that will protect natural resources and conserve scenic, historic, and open space resources for present and future generations. These resources promote a healthy environment and natural landscape that contributes to Oregon's livability." Pursuant to that goal, local governments are to inventory key resources including rivers, riparian corridors, wetlands, and groundwater resources, among other things.

related to destination resorts, which are at issue in a companion case. *Johnson v. Jefferson County (A138243)*, 221 Or App 190, 189 P3d 34 (2008).

Petitioners appealed to LUBA, arguing, as pertinent here, that the county erred in adopting the new provisions without going through a new Goal 5 process or conducting an environmental, social, economic, and energy impact (ESEE) analysis where new uses could conflict with Goal 5 resources. In particular, petitioners asserted that the amendments would allow destination resorts, which are new uses that will conflict with the protection of the Metolius River. *See generally* OAR 660-023-0250(3)(b) (discussed below). Petitioners took issue with the county's conclusion that destination resorts are not new, conflicting uses that triggered the requirements of OAR 660-023-0250(3)(b) to apply Goal 5 and conduct an ESEE analysis.

LUBA agreed with petitioners that, in the county's Comprehensive Plan, the Metolius River and its headwaters are identified as Goal 5 resources. However, LUBA disagreed with petitioners' premise that the groundwater that feeds the springs at the head of the Metolius River therefore must be an inventoried significant Goal 5 resource:

"The county's acknowledged Goal 5 program is concerned with conflicting uses that are proximate to the Metolius River and its headwaters. The mapped areas that will be eligible for destination resorts are over two miles from the Metolius River and its headwaters. With regard to the Metolius Headwater site itself, which appears to be the focus of petitioners' concern, petitioners argue that the county erred by assuming the destination resorts will have no impact on the groundwater resource that provides the entire flow of the river at its source. The short answer to petitioners' concern about potential groundwater impacts from destination resorts is that the groundwater resource upon which the Metolius River depends is not an inventoried significant Goal 5 resource. To the contrary, the county's acknowledged [comprehensive plan] concludes that the county does not have sufficient information about groundwater to perform an ESEE analysis or develop a county program to protect groundwater."

Petitioners also argued to LUBA that the county's Goal 5 inventory should have been updated when the county amended its comprehensive plan. Relying on our decision in *Urquhart v. Lane Council of Governments*, 80 Or App 176, 179-80, 721 P2d 870 (1986), LUBA concluded that counties are required to update their Goal 5 inventories during periodic reviews and are not required to update their Goal 5 inventories when adopting PAPAs. Ultimately, LUBA rejected all of petitioners' arguments concerning the groundwaters that feed the Metolius River, but remanded on several other grounds not at issue here.

Petitioners argue to this court that LUBA erred in rejecting their arguments concerning the groundwaters that feed the Metolius River. First, petitioners argue that LUBA erred in determining that the groundwaters that feed the Metolius River are not part of the resource protected by Goal 5. Petitioners invoke OAR 660-023-0250(3)(b), which provides, in part, that counties must apply Goal 5 if a "PAPA allows new uses that could be conflicting uses with a particular significant Goal 5 resource site on an acknowledged resource list." In asserting that the resource protected under Goal 5 includes not only the springs but the aquifer that is the source of the springs, petitioners rely on the following description of the "Head of the Metolius River," from the county's Comprehensive Plan:

"Large spring on base of Black Butte which is headwater of Metolius River. Spring is part of large aquifer system feeding Metolius River from Cascades."

Petitioners also point to the Comprehensive Plan's description of the Metolius River, itself a protected Goal 5 resource, as a "[h]igh volume stream of exceptionally clean cold water fed by Metolius spring, a unique point-source feature, flows through east Cascade forest land."

Relying on those descriptions, and on our decision in *Friends of the Columbia Gorge v. LCDC*, 85 Or App 249, 736 P2d 575 (1987), petitioners argue that LUBA erred because it failed to appreciate the fact that not only are Goal 5 resource sites protected, but all of the resources at those sites are protected. Thus, in petitioners' view, because the PAPAs pertaining to the development of destination resorts could affect

the groundwaters that are the source of the springs at the headwaters that feed the Metolius River, the PAPAs allow new uses that could be conflicting uses with Goal 5 resources—and, under OAR 660-023-0250(3)(b), the county is required to apply Goal 5 before adopting a PAPA.

Respondents remonstrate that OAR 660-023-0250(3)(b) specifies that it applies to resources "on an acknowledged resource list," and that, in fact, the county's Comprehensive Plan specifically *excludes* groundwaters as a Goal 5 resource. In particular, the Comprehensive Plan stated that there was "very little groundwater information" and that the county would in the future "attempt to develop inventory information." *See generally* OAR 660-016-0000(5)(b) (counties may choose not to include in inventory potential resources when it has some information about the possible existence of a resource site but lacks adequate information to identify it with particularity).[2]

We agree with respondents, and LUBA, that the fact that groundwaters are explicitly excluded from the county's Goal 5 inventory is dispositive here. That fact, and the procedural posture of this case, renders *Friends of the Columbia Gorge* materially distinguishable. In *Friends of the Columbia Gorge*, the petitioners were challenging LCDC's acknowledgment of the City of Hood River's comprehensive plan. That is, the petitioners were challenging the adequacy of the Goal 5 inventory when it was first developed. There, the city had determined that Wells Island was a significant Goal 5 resource that provided habitat for numerous species of birds, including bald eagles. The city went on to identify only heron and Canada goose habitat uses as relevant Goal 5 resources. 85 Or App at 251-52. We stated:

> "The island is a resource site, because it provides a habitat for birds; the city cannot simply decide to include only two of the many species of birds that make up that resource. * * * Therefore, its inventory was inadequate * * *."

_____

[2] The Comprehensive Plan, as amended in 2006, specifically notes that none of the groundwaters in the county meets the definition in OAR 660-023-0140 of critical groundwater areas.

*Id.* at 253. In short, *Friends of the Columbia Gorge* was a challenge to the adequacy of the inventory in the first instance. Our conclusion was that the plan, due to the flaw we identified in the inventory, should not have been acknowledged as drafted.

Here, by contrast, the county's inventory specifically excluded groundwater—and that inventory was part of a plan that has long since been acknowledged. Given that exclusion, the descriptions of the Metolius River and its headwaters in the acknowledged plan cannot reasonably be interpreted to implicitly *include* the very same potential resource that the plan explicitly *excludes*.

That then leads us to the second part of petitioners' argument—that the county was, in fact, required to update its Goal 5 inventory (and presumably at this point include the groundwater that feeds the springs at the head of the Metolius River) when it adopted the PAPAs. Petitioners acknowledge that LUBA, in rejecting that argument, relied on our decision in *Urquhart*, but urge us either to distinguish the case or to reconsider its holding in light of the fact that periodic review now occurs less frequently than was the case when *Urquhart* was decided. Respondents counter that *Urquhart* is controlling and that, in all events, its holding has now been codified in OAR 660-023-0250.

We agree with respondents that OAR 660-023-0250 is dispositive here. First, we briefly recount what was at issue in *Urquhart*. That case concerned a post-acknowledgment plan amendment that changed the designation of certain land from parks and open space to allow research facilities. 80 Or App at 178. The land in question had not been listed as a Goal 5 resource on the comprehensive plan, and the petitioners argued to LUBA that it should have been. LUBA remanded for an explanation as to why the area had not been placed on the Goal 5 inventory. *Id.* at 179. On review, we disagreed with LUBA that local governments were required to update their Goal 5 inventories in the course of the plan amendment process:

"Here, the affected area was excluded from the inventory before the amendment was enacted, and the amendment does not affect the inventory. Indeed, the converse seems to

be true, *i.e.*, the absence of the area from the inventory is what makes it possible for the new designation to be attached to the area without a Goal 5 resolution of the conflict between the area's open space use and the University/Research use called for by the amendment. *See* OAR 660-16-000(5)(a). LUBA's opinion posits that * * * factors militate in favor of the inclusion of the area on the inventory; however, none of those factors is a consequence of the amendment. Those factors may demonstrate that, for reasons unrelated to the amendment, circumstances have changed since the acknowledgment. If so, ORS 197.640 to 197.647 make LCDC's periodic review the only method for correcting goal noncompliance that results from changes in circumstances after acknowledgment, when the noncompliance is not the product of an amendment to an acknowledged plan or land use regulation."

*Id.* at 180-81 (footnotes omitted).

As noted, petitioners urge us to revisit and disavow *Urquhart*, largely because assumptions that underlay our reasoning in that case no longer pertain. In particular, petitioners emphasize that one of the statutes on which we relied in *Urquhart, former* ORS 197.640, was repealed in 1991. Or Laws 1991, ch 612, § 23. That statute had required periodic reviews to occur at least every five years. Currently, the statutes do not specify how often periodic review is to occur. *See generally* ORS 197.629 (LCDC shall establish and maintain schedules for periodic reviews).

Petitioners are correct that land use laws in general, and the statutes and rules pertaining to periodic review in particular, have evolved considerably since *Urquhart* was decided. However, one of those developments precludes the result they urge.

In 1986, as can be seen from our decision and LUBA's decision in *Urquhart*, there was an open question about when local governments' Goal 5 inventories needed to be updated. Since that time, LCDC has promulgated OAR 660-023-0250, which specifically provides:

"(3)   Local governments are not required to apply Goal 5 in consideration of a PAPA unless the PAPA affects a Goal 5 resource. For purposes of this section, a PAPA would affect a Goal 5 resource *only* if:

"(a) The PAPA creates or amends a resource list or a portion of an acknowledged plan or land use regulation adopted in order to protect a significant Goal 5 resource or to address specific requirements of Goal 5;

"(b) The PAPA allows new uses that could be conflicting uses with a particular significant Goal 5 resource site on an acknowledged resource list; or

"(c) The PAPA amends an acknowledged UGB and factual information is submitted demonstrating that a resource site, or the impact areas of such a site, is included in the amended UGB area.

"(4) Consideration of a PAPA regarding a specific resource site, or regarding a specific provision of a Goal 5 implementing measure, does not require a local government to revise acknowledged inventories or other implementing measures, for the resource site or for other Goal 5 sites, that are not affected by the PAPA, regardless of whether such inventories or provisions were acknowledged under this rule or under OAR 660, division 16."

OAR 660-023-0250 (emphasis added). That rule effectively codifies our holding in *Urquhart*—and we have said as much. *See Plotkin v. Washington County*, 165 Or App 246, 253 n 5, 997 P2d 226 (2000) (OAR 660-023-0250 "contains provisions that are identical in their operational effect to that of our holding in *Urquhart*.").

In sum, the aspect of our decision in *Urquhart* that petitioners urge us to reconsider has since been codified in an administrative rule, and petitioners do not challenge the validity of that rule but only the correctness of its application, as discussed above. Under OAR 660-023-0250, the county was not required to update its Goal 5 inventory in adopting the PAPA.

Affirmed.